**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------X
FLEET BUSINESS CREDIT, L.L.C.,                    :

                Plaintiff,                  :

                              : 02 Cv. 3721 (BSJ)(JCF)

                v.                          :

GLOBAL AEROSPACE UNDERWRITING MANAGERS     :
LTD., INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA, THE MARINE INSURANCE        :
COMMERCIAL UNION, GU INTERNATIONAL,        :
MITSUI MARINE AND FIRE, MUNICH RE,         :
EAGLE STAR, and TOKIO MARINE AND FIRE,     :

                Defendants.                 :
--------------------------------------X
HIGHLAND CAPITAL MANAGEMENT L.P.,                 :

                Plaintiff,                  :

                              : 02 Cv. 9360 (BSJ)(JCF)

              v.                          :

GLOBAL AEROSPACE UNDERWRITING MANAGERS     :
LTD., INDEMNITY INSURANCE COMPANY OF       :
NORTH AMERICA, THE MARINE INSURANCE,       :         **OPINION**
COMMERCIAL UNION, and CGU                  :
INTERNATIONAL,                             :

                Defendants.                 :
--------------------------------------X

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

#### INTRODUCTION

These consolidated cases arise out of insurance claims for

the loss of aircraft and engine parts made by Fleet Business

Credit LLC ("Fleet"), a lessor, and Highland Capital Management

LP ("Highland"), a secured lender, to Tower Air, Inc. ("Tower").

Fleet and Highland were "additional insureds" under an Airline

Hull, Spares and Liability Policy (the "Policy") issued to Tower. When Tower filed for bankruptcy, Plaintiffs attempted to recover their leased or financed equipment and found that the equipment had been stripped of numerous valuable components and parts. Plaintiffs made claims for these losses as policyholders under Defendants' "all risk" coverage. The claims were subsequently denied, and this litigation followed.

As described briefly below, numerous prior orders have narrowed the issues before this Court. Before the Court are the following claims: 1) Highland's claims for one Boeing 747-100 airframe (the "N606FF"), and two Pratt & Whitney JT9 engines (known by serial numbers "662504 and "662294"), and 2) Fleet's claims for eight missing QEC Kits and three Pratt and Whitney JT9 engines (the "United engine" serial number 685769, the "China Air engine" serial number 685694, and the "GE Wales engine" serial number 686063).[1] (Pl. Proposed Findings ¶¶ 11, 18, 21, 23, 37, 38.)

The Court conducted a bench trial in this matter from June 28 through July 7, 2010, where six prosecution witnesses and one defense witness testified. The Court has also reviewed the documentary evidence and deposition testimony offered by both parties. Having considered this evidence as well as the

---

[1] QEC stands for "quick engine change" and the term "QEC kits" is used to refer to a collection of parts that integrates an engine to an airframe. (Tr. 371:13-15; 909:4-910:1.)

2

parties' pre- and post-trial submissions, I find that Defendants did not breach their contracts with Fleet and Highland. My findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, follow.

## BACKGROUND AND PROCEDURAL HISTORY

As mentioned above, this Court has ruled on numerous earlier motions in this case, and a brief discussion of the procedural history and factual background is necessary to understanding the legal and factual issues presented during trial.

### 1. Governing Insurance Policy

In a prior order, the Court determined that the insurance policy at issue in this case is the Airline Hull, Spares and Liability Policy for the period May 1, 1999 to May 1, 2000 under which Tower is the named insured and Fleet and Highland are named as additional insureds. (Oct. 30, 2007 Order, at 5-6.) Under the financing agreements with Plaintiffs, Tower was required to insure the Fleet and Highland collateral for "all risks," including loss and physical damage, through Hull, Spares, and Liability and Deductible insurances. (Oct. 30, 2007 order at 3; Pl. Ex. 69 "Certificate of Insurance.")

Two sections of the Policy are applicable to the claims of Fleet and Highland, Part II covering the hull and Part IV covering spares. Part II of the Tower Policy covers "any

3

Physical Damage loss to ... Aircraft...." (Pl. Ex. 79 at 00087.)

"Physical Damage" is defined as "direct and accidental physical

loss of or damage to the aircraft sustained during the Policy

Period...." (Pl. Ex. 79 at 00090.) Part IV of the Tower Policy

covers Spares, which are defined as "spare engines, parts, or

equipment...." (Pl. Ex. 79 at 00092.) Part IV also contains a

number of exclusions which further define "spares." For example,

Exclusion (j) provides that the insurance shall not apply to

"mysterious disappearance or unexplained loss or shortage

disclosed upon taking inventory." (Id.)

The Policy also contains a "Cross Liability Provision"
which states:

> This insurance shall provide the same protection to
> each Insured hereunder as would have been available
> had this policy been issued separately to each
> Insured, except that in no event shall the Insurers
> total liability exceed the Limits of Liability set
> forth in the Declarations. This provision shall not
> operate or apply to any claim for loss of or damage to
> property insured under Part II [the All Risk Hull
> Coverage] or Part IV [the All Risk Spares Coverage] of
> this Policy.

(1998-1999 Policy Wording General Policy Conditions § 14

(emphasis added).  In its October 30, 2007 Order, this Court

stated that "[b]y its plain terms" this provision provides that

Tower, Fleet, and Highland would each be treated as having "the

same protection as if each insured had procured the policy

separately, except with respect to the All Risks coverage."
(Oct. 30, 2007 Order, at 16.)

## 2. Partial Summary Judgment Order

In its July 28, 2009 Order, this Court adopted a report and
recommendation of Magistrate Judge Francis and granted partial
summary judgment in favor of Defendants. The Court dismissed
those of Plaintiffs' claims pertaining to "accounted for" parts
which were removed intentionally by Tower before a June 14, 2000
directive by the Tower bankruptcy trustee. (July 28, 2009 Order,
at 4.)

The Court found that the "accounted for" losses were not
covered by the policy because they were not fortuitous. Under
New York law, a plaintiff seeking insurance coverage for a loss
must first show that the claimed loss was fortuitous. As will
be described in more detail below, intentional losses are not
fortuitous. The Court first determined that under the cross
liability provision of the policy, fortuity was not to be
evaluated from the perspective of the Plaintiffs alone, but from
the insureds' joint perspective, in accordance with the October
30, 2007 order of this Court. Plaintiffs had argued that they
were "innocent coinsured" parties and were entitled to coverage.
The Court rejected this argument, stating that the Cross
Liability Provision specifically exempted the all risks coverage
that Plaintiffs' claims were based on and that no theory of the

5

"innocent coinsured" doctrine could override such explicit contractual language, especially between "large, highly sophisticated parties who presumably conducted arms-length negotiations to allocate risks and calculate premiums." (June 18, 2009 R&R, at 12; July 28, 2009 Order (adopting R&R and specifically approving of the Magistrate Judge's innocent coinsured analysis).) Therefore, any losses caused by the intentional conduct of Tower were not recoverable.

As a result of the Court's 2009 summary judgment ruling, Plaintiffs' remaining claims have been limited to missing parts and equipment: (a) which are unaccounted for (i.e. not documented in Tower's records); or (b) which were removed after the date that Tower's bankruptcy trustee directed that no further parts were to be taken from Plaintiffs' equipment. This Court ruled that there was a genuine issue of material fact as to whether these losses were fortuitous, and if so, whether they were properly denied by Defendants under an applicable policy exclusion.

On November 23, 2009, the parties submitted their respective Pretrial Memoranda. Defendants also filed three motions *in limine*, which the Court reserved ruling on until after the witnesses had been heard.[2]

---

[2] Defendants' motions *in limine* sought to (1) preclude Fleet from pursuing claims for more than four QEC kits; (2) preclude Plaintiffs from pursuing claims for and presenting evidence pertaining to damages other than the

6

This Court held a bench trial June 28 through July 7, 2010. Plaintiffs called six witnesses during the bench trial: Mark Drechsler, a former Fleet employee who is now employed by Fleet's successor; Charles Stanziale, the bankruptcy trustee for Tower; Nick Popovich, Fleet's expert witness and an active participant on behalf of Fleet, Highland, and other Tower creditors in efforts to recover parts and equipment; Gillian Sartini, a fact witness who was involved in Highland's efforts to value its equipment; Todd Travers, a former Highland senior portfolio manager; and Tom Heimsoth, a senior vice president of Fleet Capital Leasing.

After several of Plaintiffs' fact witnesses testified, Defendants moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), arguing that Plaintiffs had been fully heard on the issue of whether or not there was a fortuitous loss and had failed to meet that burden.  The Court reserved decision.  Defendants renewed these arguments at the close of Plaintiff's case in chief and the Court again reserved decision.  After Plaintiff rested, Defendants called William Isakson, an adjustor and surveyor for aviation insurance claims and an expert witness.

---

alleged fair market value of those missing aircraft and engine parts defined in the Court's Opinion and Order dated July 28, 2010; and (3) preclude all testimony of Gillian Sartini.

Both parties also submitted excerpts from the depositions of several individuals which were received into evidence at trial.  These witnesses included: Richard Acquavita, formerly Tower's Director of Maintenance and Director of Quality Control; Terrence Dennison, who served as the Chief Operating Officer of Tower under the bankruptcy trustee; Roland Hannula, Tower's former Director of Quality Control; John McCormick, an inspector for Sage-Popovich; and Al Monti, formerly a mechanic for Tower. These depositions proved to be highly relevant to the Court's factual findings in this case.

Upon the close of the evidence, the Court reserved decision pending receipt of proposed findings of facts and conclusions of law.

## FINDINGS OF FACT

### 1. Overview of Events Leading to this Lawsuit

Prior to April 2000, Tower was an airline operating a fleet of Boeing 747 aircraft for scheduled passenger service between New York's John F. Kennedy International Airport ("JFK") and various domestic and international destinations.  (Tr. 133:13-134:17.)  Beginning in October 1996, the predecessor in interest to Fleet purchased and then leased back to Tower, among other equipment, at least eight QEC Kits and three Pratt & Whitney JT9 engines.  (Pl. Ex. 42.)  On August 21, 1997, Highland extended a loan to Tower which was secured by, among other equipment, one

8

Boeing 747-100 airframe and two Pratt & Whitney JT9 engines. (Highland Compl. ¶ 11.) These pieces of equipment, along with various corresponding records, are the subject of Plaintiffs' claim. (Gorman Letter, July 1, 2010.)

Tower filed a Chapter 11 Petition in the United States Bankruptcy Court for the District of Delaware on February 29, 2000. On May 1, 2000, Tower ceased its scheduled passenger flights. After that date, Tower only operated limited charter service. (Tr. 147:5-149:25.) Tower operated as a debtor in possession until May 5, 2000, when the Bankruptcy Court appointed Charles Stanziale to act as Chapter 11 Trustee. (Tr. 134:23-135:7, 133:18-20.) When efforts to find a buyer for Tower proved unsuccessful, the Trustee proceeded with liquidation and ultimately the Tower Bankruptcy proceeding was converted to Chapter 7. (Tr. 190:25-191:1.)

As part of his evaluation of Tower's operations, the Trustee consulted with maintenance staff at Tower and reached the conclusion that Fleet's aircraft "had a limited amount of time available for use; and while at least two of them could fly, that they could only fly for a limited period of time before they would require a major overhaul." (Tr. 170:13-171:10.) On the basis of this information, the Trustee "had no intention of either renewing the lease [with Fleet] or taking any other steps toward those aircraft." (Id.)

9

Both Fleet and Highland quickly informed the Bankruptcy Court that they were concerned that parts were being removed from their collateral to keep other planes functional, a process referred to in the industry as "robbing." Fleet filed a motion in to ground its equipment, which was heard by the Bankruptcy Judge on May 10, 2000. During that hearing, Fleet's counsel noted on the record an agreement with the Trustee that no equipment or components were to be removed from Fleet's aircraft. (Pl. Ex. 10 at 3; Tr. 137:4-138:14.) At the same hearing, counsel for Highland requested permission to take back its collateral pursuant to 11 U.S.C. § 1110. Highland expressed concern that their collateral was in jeopardy of being taken and used on other Tower airplanes. (Pl. Ex. 10 at 9.)

In early to mid June 2000, Stanziale posted a sign informing Tower employees that "No aircraft or engine parts may be robbed without written approval" from himself or another senior staff member, Terrence Dennison. (Pl. Ex. 11.)

Highland physically removed its collateral from Tower's facility on or about July 28, 2000. (Tr. 499:24-500:23; Pl. Ex. 50.) Fleet physically removed its leased equipment from Tower's facility in August and September 2000. (Pl. Exs. 6, 104.) Both Plaintiffs claim that when they sought to retrieve their equipment several pieces were missing.

**2. Findings Regarding Missing Equipment**

10

## A.   Culture of Robbing Parts by Tower Airlines

The evidence submitted at trial demonstrates that Tower had
a history of reliance on a process known as "robbing" in which
it removed operational parts from aircraft on the ground for use
in other aircraft. (Tr. 757:29-758:7; Dennison Dep. at 28:17-
38:12; 103:7-104:6; 104:12-105:5.)  This practice was common at
Tower, as it was at other airlines, to "keep airplanes flying."
Roland Hannula, Director of Quality Control at Tower during XXX,
testified that "robbing" had been a common and accepted practice
at Tower since he began work there in 1991. (Hannula Dep. 46:2-
17.)  Al Monti, a Tower mechanic who was later hired as a
consultant for Fleet, testified that "[t]hat [robbing] was the
thing they [Tower] did when they didn't have the parts in stock,
which was more often than having them."  (Monti Dep. at 36:17-
37:17.)

## B.   Robbing Became More Frequent During Bankruptcy Process

The credible testimony of various witnesses further
supports the factual finding that this practice became more
common at Tower as its financial situation worsened in 1999 and
2000.  This Court credits the deposition testimony of Al Monti,
who recounted that most of the components that were missing from
the aircraft recovered by Plaintiffs were removed to accommodate
other aircraft.  He specifically recalled in May 2000 moving

11

Fleet's United Engine (serial number 685769) to the United
Airlines facility for safekeeping.  The engine was "picked
clean."  When asked to clarify whether he meant that "parts were
removed by Tower people and put on other Tower aircraft to
maintain that aircraft," Monti replied "that is correct ... all
of the components, usable components, were removed from the
engine."  (Monti Dep. at 39:10-23.)

Terrence Dennison served as the Chief Operating Officer of
Tower, appointed by the bankruptcy trustee. He was employed by
Tower from May 8, 2000 until 2001 and oversaw "the general
operation of the entire company under the bankruptcy and to
supervise ... all of the operating departments and the personnel
of the company." (Dennison Dep. at 11:4-8.)  Dennison testified
at his deposition about the culture of robbing at Tower:

> [F]rom my specific knowledge of looking at the way
> that company had been operated for some considerable
> time before we arrived, there was evidence of ...
> robbing parts, rob a part from Peter to pay Paul type
> thing. This had gone on for a long time in that
> organization....
>
> ... Now, what I believe was going on for some time was
> the airline, as it ran into financial problems, didn't
> have the money to pay vendors to get the repaired
> parts back. Originally, they would send the part out
> and get it repaired and it would come back and be a
> spare.
>
> So, over time, a large number of parts and components
> got out into the chain of repair station and overhaul
> facilities all over the country, and in some cases all
> over the world. And they were sitting there being held
> hostage for repair bills that weren't paid. They

12

literally – they started taking parts off of
airplanes. If an airplane was in the hangar, as one of
the Fleet airplanes was, on a B check and the flying
airplane needed a widget, well, they knew there was a
widget on the one in the hangar. And they knew it
wasn't going anywhere. So, they took the widget off of
the one in the hangar and put it onto the flying
airplane. This went on and on. The problem with
knowing where these went is it was a – just a
horrendous record keeping job to try to trace down
where all these parts might have gone, where they even
were removed....

... I don't think it was a case where, you know, there
was somebody selling off parts overseas or taking
parts off an airplane and selling them to make money
or something like that. I think it was a system of
record keeping that, over time, they lost control of.
And they lost control of it, first, because they lost
control of the financial ability to keep the flow of
these parts going.

(Id. at 31:7-34:8.)

Following its declaration of bankruptcy, Tower had three
airplanes that were airworthy and met federal regulations.  (Id.
at 14:11-15.)  The difficulties of maintaining these three
airplanes increased Tower's reliance on robbing parts during
bankruptcy. By the time the Bankruptcy Court appointed a
Chapter 11 Trustee in May 2000, there were no funds available to
purchase new parts or have parts repaired. (Tr. 151:12-152:8.)
GMAC, as the priority lien holder for the spare parts inventory,
had taken control of much of the operation by the time the
Trustee was appointed. Stanziale, the Trustee, testified that
when he took the position "GMAC had virtually shut down the
operation . . . any monies spent would have to be specifically

13

authorized by GMAC." (Tr. 152:2-8.) The weight of the
testimony presented at trial and via deposition transcripts
demonstrates that Tower mechanics had few alternatives to
robbing parts from airframes and engines that had been taken out
of service, in an effort to keep the remaining aircraft
airworthy. (Dennison Dep. 38:3-13.) Credible evidence
demonstrates that Tower would "rob" parts off other planes to
ensure that the three operational planes continued to fly.
"[T]hey destroyed the aircraft that were there in order to keep
certain aircraft flying, and they were destroyed only because it
was an easy stockroom to go to when you didn't have the money to
buy the parts." (Monti Dep. 76:20-25.)

## C. Plaintiffs' Awareness of Robbing at Tower

The representatives of both Plaintiffs made statements
during the period of Tower's trusteeship that further support
the finding that the missing parts were intentionally robbed by
Tower's employees to maintain the remaining Tower planes.
Tower's creditors, including Fleet and Highland, were well aware
of Tower's practice of robbing, and made their concerns known to
the Bankruptcy Court, as mentioned above. (Def. Exs. 61; 66;
67; 71; 72; 76; 79; Tr. 139:11-19.) For example, at a May 9,
2000 hearing, Highland informed the Court that two of their
engines had been "cannibalized rather severely" and asked for
assurances that the debtor not use the Highland engines and that

14

there be no cannibalization or swapping of parts using Highland equipment.  (Pl. Ex. 10 at 9-10.)   On June 14, 2000, a representative of Highland informed the Bankruptcy Court by letter that it sought emergency relief "due to Debtor's cannibalization of the subject engines" despite prior assurances that robbing from Highland property would stop.  (Pl. Ex. 14.)

Additionally, on April 20, 2000, Fleet even moved two of its leased engines, which were off wing and stored at Tower's facility, to a United facility so that Tower "couldn't use them, use parts off of them...." (Tr. 698:16-699:18.)  Mark Dreschler, asset manager for Fleet, testified that he met with Tower management numerous times throughout the bankruptcy and was assured that Tower would replace the missing parts.  (Tr. 87:9-88:22.)

## D.  No Evidence of Unauthorized Removals by Tower Employees

The credible testimony presented at trial also establishes that Tower management was aware that Fleet and Highland collateral were being robbed of parts, even during the bankruptcy process and after Tower issued the June directive to all employees to stop robbing parts.  Terrence Dennison, Chief Operating Officer under the Trustee, testified that even after the issuance of the June directive, he believed robbing likely persisted "because we were operating airplanes, . . . we ended up just operating one lessor's or finance outfit's airplanes.

15

And I know we would swap parts in between those to keep those going." When asked if the post-directive robbing was done with the consent of management, Dennison responded "Oh yeah, yeah." (Dennison Tr. 37:25-38:13.) While the trustee Stanziale testified that he did not authorize any robbing of parts while he managed Tower, he also testified that he was not aware of any theft of parts by third parties or Tower employees for their own benefit. (Tr. 183:13-184:11.)

Plaintiffs have offered no direct evidence that Tower employees were acting contrary to the instructions of management at any point before or after bankruptcy. Further, the factual findings described below—namely, the strong security presence installed on site, labor intensive nature of the parts removal, and severe reduction in Tower's mechanical staff—make it unlikely that Tower employees were acting outside of the scope of their employment or against the wishes of Tower management, who by most accounts were trying desperately to satisfy creditors and maintain the charter operation during this time.

The absence of records or testimony that management was specifically authorizing each "robbery" does not establish that such removals were "unauthorized" and therefore not the intentional conduct of Tower. Rather, the testimony presented demonstrates that more likely than not robbing was a longstanding practice at Tower that continued throughout its

16

entire operational life, until even the charter service ceased.
The evidence further supports a finding that management was
likely aware this was occurring even after the June directive,
as Tower mechanics had few alternative ways to acquire the parts
necessary to maintain charter operations.

### 3. Tower's Inability to Maintain Accurate Records

Even prior to bankruptcy, Tower Airlines struggled to
maintain accurate records. Sage-Popovich, the consultant hired
to investigate Fleet's collateral, reported to Fleet on several
occasions, some even prior to the Bankruptcy filing, that there
were gaps in Tower's recordkeeping. (See, e.g., Def. Exs. 285,
204, 154, 311; Tr. 76:10-15, 80:14-81:8; 109:10-111:12; 123:12-
125:12.) Highland knew of this problem as well.  (Tr. 627:8-
628:12.)

The testimony offered by the parties also demonstrates that
Tower "lost control of" its record keeping system during the
bankruptcy process.  (Dennison Dep. 34:4-8; 36:3-18.)  After
Tower entered bankruptcy, Tower greatly reduced their staff.
(Tr. 359:10-14.)  For example, Tower employed 50 mechanics
before the Trustee was appointed, and this number was "reduced
to almost nothing" after.  "Within the first week [after
appointment, the Trustee] eliminated a couple hundred people."
(Dennison Dep. 78:17-79:4.)  Roland Hannula, the Director of
Quality Control who was charged with recordkeeping, had his

17

staff of 20 cut to two employees.  (Hannula Dep. 69:8-70:12.)
Hannula testified that he was operating with a "skeleton staff"
and that records were not updated.  (Hannula Dep. 79:19-80:11.)
He also testified at his deposition that records known as "M35
tags" were lost, and there was a continuing problem with failure
to affix M35 tags on overseas flights.[3]  (Hannula Dep. at 66:2-
10; 101:25-102:6.)  This deposition testimony was confirmed by
the viewing of video at trial of the N606FF airframe in which an
entire plastic bag of yellow M35 tags were shown stowed on the
floor of the avionics compartment. (Tr. 835:16-836:13; Pl. Ex.
53.)

Sage-Popovich, an aviation consulting firm, performed a
full inventory of Tower's spare parts in the summer of 2000
after the bankruptcy trustee had taken over. (Tr. 362:2-6.) Nick
Popovich testified at trial that his firm found that "Tower had
mechanics who were going into the stores and taking parts
without going through the stores clerk and following all of [the
normal recordkeeping] processes...." (Tr. 362:10-15.)  Popovich
stated that Tower's mechanics were "coming in taking parts
without... strict compliance [with the federal guidelines]. A
lot of them, to the best of our knowledge weren't authorized by
any supervisor to remove the parts. There was no requisition,

---

[3] M35 tags were part of the record keeping system required when a part was
robbed.  (Hannula Tr. 61:21-67:19.)

18

there was no nothing." (Tr. 362:22-363:1.)  Popovich also
testified that Tower never fully made the transition from their
outdated computer system to the Perez system, the latest
recordkeeping software system, because Tower ran out of money.
(Tr. 217:10-25; 232:15-21.)  In short, Tower "lost control" of
their recordkeeping system "because they lost control of the
financial ability to keep the flow of these parts going."
(Dennison Dep. at 31:7-34:8.)

### 4. Absence of Evidence Supporting Plaintiffs' Claim of Theft

The evidence submitted by Plaintiffs at trial did not
support a finding that the missing parts were actually stolen.
Rather, the weight of the evidence demonstrated that it was
highly unlikely that any parts could have been stolen by a third
party or Tower employee for personal gain.

The Tower Bankruptcy Trustee was never made aware of any
theft of parts from airframes or engines, nor was the Trustee
ever told that any employee of Tower was removing parts for
personal gain. (Tr. 180:20-22; 183:9-18; 184:3-11.)  Had
millions of dollars in airframe or engine parts disappeared as a
result of a suspected theft or pilferage, the Trustee would have
been duty-bound to investigate and take appropriate steps, such
as having a police report filed and filing an insurance claim.
(Tr. 183:2-8; 175:19-176:3; 181:21-25.)  Neither Tower nor the

Bankruptcy Trustee reported a theft or made an insurance claim for the theft of parts.[4]

Numerous witnesses also testified that many of the missing parts would have required many hours of labor to remove.  Walter Isakson, Defendants' expert witness and an insurance investigator of Tower's claims during the bankruptcy, testified at trial regarding his work investigating the situation at Tower.  In concluding that the missing parts were likely removed to be used on other Tower aircraft, Isakson relied on a number of observations.  He noted that the parts were removed without "rhyme or reason" from virtually every part of planes, "it was just a generalized removal of all types of equipment, and a lot of the equipment is not simple to remove."  Almost every part required at least one tool to be removed properly; many parts required lifts and jacks "30 feet in the air" or "specialized tools" to be removed without damage.  (Tr. 38:21-39:8.) Additionally, Fleet's expert witness Nick Popovich testified that the removal of four QEC kits would have taken 800 to a thousand man hours and could not have been completed in a single day.  (Tr. 380:9-12, 392:1-10.)

---

[4] Although Mr. Popovich claims that his company filed a police report on behalf of Plaintiffs Fleet and Highland regarding a suspected theft, the person who allegedly filed the report, John McCormick, testified at his deposition that he filed a missing material report with the JFK Airport police with respect to GMAC inventory, not that of Fleet or Highland. (Def. Ex. 388.) Additionally, Popovich emailed a representative of GMAC on September 29, 2000 advising that a police report was filed on behalf of GMAC. (Def. Ex. 236; Tr. 342:3-24.)  Plaintiffs also did not offer a police report into evidence.

20

The testimony of Plaintiffs' witnesses also demonstrates that Tower's equipment and airplanes were kept in a secure environment at all times even during bankruptcy. (Hannula Dep. 32:21-34:18.) A security system was in place where access was only given to Tower employees and its permitted guests. (Dennison Dep. 16:14-25.)  Security staff was present seven days a week, 24 hours a day.  Airport police were instructed to keep an extra eye on the facility.  (Dennison Dep. 34:19-24; Stanziale Dep. 91:2-25.)  The Trustee described security at Tower as "tight, serious, and adequate."  (Tr. 180:3-6.)

There is no evidence that any Tower personnel observed an absence of airframe or engine parts that had not been removed in the ordinary course of business by Tower personnel.  Mark Drechsler, the asset manager for Fleet, saw during a June 12, 2000 visit that parts were missing from an airframe and engines and discussed missing parts during in-person meetings with Tower personnel, but was never told of any theft of parts or records. (Tr. 94:14-22.)  Drechsler testified that Dennison and another representative of Tower told him that "some parts were out for overhaul and some parts were being borrowed for other aircraft." (Tr. 46:2-18.)  He was assured that there was no problem and that Tower would replace the missing parts.  Drechsler believed them.  (Tr. 44:10-45:24; 89:14-91:3; 93:23-94:22; 87:16-21; 88:12-22; 89:24-91:3.)

21

Indeed, Drechsler returned to Tower's facility a number of times, and each time he asked Tower personnel for the return of the parts and looked for records.  (Tr. 66:2-22; 94:23-96:13.) Drechsler would have had no reason to ask Tower for the parts and records if there had been any indication that they had been stolen.  To the contrary, Drechsler's actions demonstrate that Drechsler operated under the belief that all of the parts missing from the Fleet equipment had been "robbed" by Tower. Additionally, Todd Travers, who oversaw the Highland loan to Tower, knew of no evidence that anyone other than Tower removed Highland's loan collateral. (Tr. 659:5-17.)

Plaintiffs attempt to explain the missing parts by offering testimony that the parts were robbed by the representatives of other entities seeking the return of their collateral. Plaintiffs rely on Popovich's testimony that these representatives "ran wild and just took parts" before the Trustee took control.  (Tr. 261:10-262:9.)  Plaintiffs also rely on an October 2000 email from Popovich to the Trustee regarding a "serious problem" arising when a mechanic was caught taking parts packed by GMAC for use on another creditor's airframe. However, later in the same email, he attributes this conduct to favoritism being shown to certain creditors at "the Trustee's discretion."  (Pl. Ex. 17; Pl. Proposed Findings of Fact ¶ 64.) The Court finds these allegations unpersuasive and concludes

22

that the evidence offered by Plaintiffs is insufficient to establish that the missing parts were robbed by representatives of other entities rather than by Tower employees.

### 5. Specific findings regarding equipment claimed as missing

In addition to these general findings, the Court makes the following specific factual findings regarding the losses claimed by Plaintiffs. The Court notes that Defendants did not bear the burden of proving what happened to each claimed loss. However, evidence was presented that demonstrates what likely caused the losses for much of Plaintiffs' equipment. These findings, set forth below, provide further support for this Court's broader finding that the parts went missing as a result of the intentional conduct of Tower.[5]

### Fleet Equipment

- China Air Engine: The weight of the evidence produced at trial proves that the China Air Engine (serial number 685694) was shipped to the China Air facility in 1999 "after being cannibalized by Tower Air." (Pl. Ex. 38 at Tab 9.) Plaintiff's own expert witness, Nick Popovich

---

[5] At trial, the parties elicited a significant amount of testimony regarding the number of QEC kits properly claimed by Plaintiffs. The Court makes no specific finding as to the exact number of QEC kits at issue because Plaintiffs have failed to satisfy their burden that the loss of any parts, including any QEC kits, were fortuitous, as discussed in detail below. See Pl. Proposed Findings at ¶ 18 n. 5 ("For the purposes of this Court's coverage determination ... the total number of QEC kits which are missing is irrelevant. The issue can be resolved, if necessary, after the coverage determination is made.").

23

reported this conclusion in his proof of loss submissions
to the insurance underwriters.  (Id.)  A report by China
Airline dated March 27, 2000 documented that the engine
arrived at their facility missing numerous parts, including
most of those claimed by Fleet as missing.  (Id.)  The
weight of the evidence demonstrates that Tower Air
employees robbed numerous parts from the China Air engine
before it was sent to China Air for repairs.  While
Plaintiffs contend that there is no proof that these
missing parts were actually robbed by Tower employees,
Plaintiffs can point to no evidence that would suggest a
different conclusion; rather Nick Popovich, Fleet's own
expert, also concluded that the parts had been robbed by
Tower.  (See Pl. Post Trial Response at 9.)

• GE Wales Engine:  The GE Wales Engine (serial number
686063) was taken off wing and sent to the GE Wales
facility (referred to as GEAEX) for repair in June 1999.
GE's records show that numerous parts were missing upon
receipt of the engine; Popovich concluded in his proof of
loss documents that "the engine was shipped without certain
components, further, while at GEAEX, the engine was robbed
at the direction of the operator to supply parts for other
engines which could be returned to service quicker."  (Pl.
Ex. 38 at Tab 5.)  Popovich explained at trial that Tower

24

directed GE to rob the combustor case from the GE Wales
engine to make another Tower engine operational.   Popovich
testified that this was documented by an email, rather than
through the official Tower record-keeping system.   (Tr.
311:1-9.)   Further, Fleet was aware as of July 1999 that
parts were robbed off its Wales and China Air engines and
specifically attributed the robbing to Tower Air.   (Def.
Ex. 371.)

• United Engine:   Engine serial number 685769 was taken off
wing on November 30, 1999 and stored on an engine stand at
Tower Airlines' JFK facility.   Popovich reported to Fleet
management in early 2000 that a number of parts had been
removed from the United Engine without being properly
tagged according to Tower's recordkeeping procedures.   In
April 2000, the engine was moved to the United Airlines
facility because of concerns that parts would go missing
from the engines if they remained in the Tower hangar.
(Tr. 91:20-25.)   Mark Dreschler of Fleet testified that
when he observed the engine in June 2000 it was missing
parts, but he was "assured that those parts were going to
be replaced."   (Tr. 90:12-91:3.)

Highland Equipment

• Airframe N606FF:   Highland's airframe N606FF was removed
from service and parked on Tower Air's ramp at JFK in

25

November 1999.  (Pl. Ex. 23.)  Highland did not physically

remove its collateral from Tower's facility until

approximately July 28, 2000.  (Pl. Ex. 50.)  This Court

credits the testimony of defense expert William Isakson

that Highland's list of missing parts contained numerous

errors, including 16 parts that were actually documented as

robbed in the logbooks.  (See Def. Demonstrative Ex. 16.)

Tower's records indicated that at least 71 parts were

robbed with proper documentation from November 24, 1999 and

May 24, 2000.  Thus, Tower mechanics were clearly

accustomed to robbing parts from the airframe.  Given the

weight of the evidence establishing that security was a

priority at the Tower facility and increasing strains were

placed on Tower's staff, the Court finds that more likely

than not all of the missing parts were robbed by Tower

personnel to service Tower's operations.  This conclusion

is supported by the June 15, 2000 testimony of counsel for

Highland at the bankruptcy hearing "that regardless of the

order that was agreed to, that parts were being taken off

of our air frame [N606FF] and put on other planes, and we

know which planes they were put on which are not our

collateral."  (Def. Ex. 69 at 16.)

- Engine 662294:  This engine was located in the Tower Air

  hangar at JFK as of Sage-Popovich's February 2000

inspection and audit report.  The engine had been out of
service for mechanical reasons since November 17, 1999 and
was installed on airframe N607FF.  (Def. Ex. 28 at 12.)
The report indicated that as of that inspection "the engine
was found in poor condition and several components were
missing including the fuel heater, generator and reverser
drive unit."  (Id. at 12-13.)  Again, statements by
Plaintiff Highland at that time indicate that they believed
Tower was responsible for the robbing of parts from this
engine "for use on other engines."  (Def. Ex. 76 at 6.)

• Engine 662504:  As of the February 2000 Sage-Popovich
report, this engine was installed on airframe N613FF "in
very poor condition and heavily robbed of components.  90 -
95% of the engine is missing . . . including QEC and
gearboxes."  The report also detailed that the engine had
been stored on the runway and had severe rust damage.

## CONCLUSIONS OF LAW

### 1. Applicable Law

As mentioned above, the Court's prior rulings in this case
have significantly narrowed the issues to be addressed by this
trial.  As explained in Magistrate Judge Francis' Report and
Recommendation and adopted in this Court's order for partial
summary judgment, under New York law, "in order to recover under
an all risk policy, the burden of proof is on the insured to

27

prove a fortuitous loss of the covered property." In re Balfour MacLaine Intern. Ltd. 85 F.3d 68, 77-78 (2d Cir. 1996) (citations omitted). As both the hull and spare policies applicable in this case were all risks policies, as a threshold matter Plaintiffs must show that their losses were fortuitous by showing that they were not due to the intentional conduct of Tower.

## A. Legal Standard for Fortuitous Loss

The burden on an insured to establish a prima facie case by showing that the loss was fortuitous is "fairly light." An insured does not have to prove the precise cause of the loss. International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76, 83-84 (2d Cir. 2002). To establish that a loss was fortuitous, the insured must show by a preponderance of the evidence—or more likely than not—that the loss was not intentional. See Ressler v. White, 968 F.2d 1478, 1479 (2d Cir. 1992)(affirming as "correct" a district court's instruction in an insurance case that the plaintiff had to prove by a preponderance of the evidence that the loss was fortuitous). As will be discussed below, Plaintiffs fail to meet even this "fairly light" standard.

"Broadly stated, the fortuity doctrine holds that 'insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially

28

certain to occur. New York has codified a somewhat narrower version of the doctrine under which ... a fortuitous event [may be defined as] 'any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party.'" Nat'l Union Fire Ins. Co. v. Stroh Co., 265 F.3d 97, 106 (2d Cir. 2001) (citations omitted). While the insured "need not prove the cause of the loss," proving fortuity requires more than simply showing that insured items are unaccounted for. Id. The Second Circuit has held that when a loss is the result of the "intentional misconduct of the insured," it is not fortuitous. Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 307 (2d Cir. 1987).

## B.  Effect of the Cross Liability Provision

As the Court ruled on July 28, 2009, because the Cross Liability Provision specifically exempted the all risks hull and spares coverage at issue here, the Policy is not interpreted from the perspective of each plaintiff as if the Policy had been procured separately.  Rather, the interests of the Plaintiffs are interpreted jointly with Tower, the other policy holder. Therefore, under the prior rulings of this Court, Plaintiff must show the claimed losses at issue were fortuitous—or unintentional—from the perspective of the original insured, Tower Air.

29

In their post-trial submissions, Plaintiffs attempt to circumvent the Court's prior rulings on the effect of the Cross-Liability provision. Plaintiffs argue that under the fortuity doctrine they only have to show that they endured a loss that they did not plan, intend, or expect; they argue that they do not have to prove the cause of the loss "whether it be intentional acts taken on behalf of Tower Air, or some other cause." (Pl. Proposed Findings at ¶28.) They further contend that the Court only held that under the precise language of Part II Plaintiffs could not recover for the intentional acts of Tower because those losses could not be deemed "accidental," as required by Part II of the Policy. (Pl. Proposed Findings at ¶¶25-26.) Thus, under Plaintiffs' theory, they merely need to show that Fleet and Highland did not know of, expect, or intend their loss. Once this showing has been made, the burden would then shift to Defendants to prove that an exclusion to coverage applies, which Plaintiffs assert Defendants cannot prove.

Plaintiffs' argument contradicts this Court's holding in its July 28, 2009 opinion adopting the Report and Recommendation of Judge Francis. This Court held that it agreed "with the Magistrate Judge that the innocent coinsured rule is not applicable in this case and adopts the Magistrate Judge's conclusion that intentional acts by Tower may not serve as the basis for recovery by Fleet and Highland." (July 28, 2009 Order

at 5.)  While the Court's opinion adopting the Report and
Recommendation specifically analyzes only the "accidental"
coverage requirement in Part II of the Policy, this discussion
should not be read to alter the threshold requirement that
losses be fortuitous from the perspective of Tower.  Notably,
Plaintiffs previously raised this argument in a motion for
reconsideration, which this Court denied on August 25, 2009.  To
now argue that they have satisfied their burden to show
fortuitous loss because "it is undisputed that plaintiffs
are not seeking to recover for losses that they, as
policyholders, knew of, planned, intended, or [were] aware [was]
substantially ceratin(sic) to occur" ignores this Court's prior
rulings and highlights Plaintiffs' inability to offer evidence
sufficient to satisfy their burden.

## B. Plaintiff's Breach of Contract Claim

Plaintiffs have failed to meet their burden of proving by a
preponderance of the evidence that the losses they sustained were
fortuitous and thus covered by the Tower Policy.  Throughout the
trial, counsel for Plaintiffs represented that they have no
evidence of what happened to the property that forms the subject
of their claims.  (Tr. 458:8-16, 18-21; 461:3-9; 468:19-469:6;
474:8-10.)  While insureds are not expected to know the cause of
such loss, they are expected to submit evidence that the loss
was, in fact, fortuitous.

31

The weight of the credible evidence, however, proves the contrary, that Tower intentionally removed Fleet and Highland's missing parts to service its other airplanes.  The evidence does not support Plaintiffs' theory that unauthorized third parties or rogue Tower personnel were responsible for the missing parts. As described in the Court's factual findings, Tower had a long-standing practice of removing parts from aircraft and engines that were not in use and using those parts to make other aircraft and engines operational.  The evidence has also established that Tower had a history of poor recordkeeping that worsened with the bankruptcy and subsequent reduction in maintenance staff.[6]  Further, the testimony of multiple witnesses demonstrated that Tower maintained high security at its facility during the bankruptcy.  Many of the parts claimed as missing would have required specialized tools and many hours of work to remove.  These facts make it highly unlikely that parts were stolen by a third party or taken by a Tower employee for personal gain.  Not only have Plaintiffs failed to demonstrate that their losses were fortuitous, the weight of the evidence

---

[6] The parties also dispute whether Plaintiffs' claim for missing records is covered under the Policy, though Plaintiffs do not address this issue in their post-trial submissions.  After reviewing the Policy, the Court finds no support for Plaintiff's contention that the loss of records is covered under the spares or the hull coverage.  Further, even if records could be considered part of the "equipment" of an aircraft, Plaintiffs have not met their burden of showing that such losses were fortuitous.

32

proves by a preponderance of the evidence that the cause of Plaintiffs' losses was Tower's intentional conduct.

Plaintiffs argue that "to the extent parts were removed ... in order to make serviceable other aircraft and engines owned or financed by other Tower creditors ... such removals would not have been permissible and would not have been properly authorized in accordance with Tower Air's maintenance procedures." They apparently contend that where there was not specific approval to "rob" obtained from Tower management, the conduct was not intentional by Tower. This argument fails both legally and factually.

Factually, as discussed above, Plaintiffs offer no persuasive evidence that other creditors actually caused parts to be placed on their collateral from other planes. No witnesses testified that they observed this occur, and only Nick Popovich testified that he believed this happened.

In attempting to support this theory, Plaintiffs devoted much of their time at trial to proving that Tower had elaborate recordkeeping procedures. They contend that the lack of records for the claimed losses demonstrates that these removals were unauthorized by Tower management. However, the evidence presented at trial shows Tower had a consistent and long-standing lack of compliance with record-keeping procedures that only worsened in bankruptcy. Numerous witnesses provided

33

credible testimony that as Tower's resources were strained, record-keeping suffered. Therefore, the lack of a record documenting a "rob" does not demonstrate that the "rob" was unauthorized. Rather, given Tower's strained situation, the Court finds it more probable that employees were bypassing normal record keeping requirements in a desperate attempt to keep Tower's few remaining planes operational.

Legally, Plaintiffs fail to offer any authority for the proposition that an employee's act not explicitly authorized by Tower management cannot constitute the "intentional conduct" of a corporation. While the facts presented here are somewhat unique, generally, acts of employees can be attributed to the corporation under certain circumstances. Under New York tort law, the acts of employees can be imputed to a corporation under the doctrine of vicarious liability if the acts were committed "in furtherance of the employer's business and within the scope of employment." Holmes v. Gary Goldberg & Co., Inc., 40 A.D.3d 1033, 1034, 838 N.Y.S.2d 105, 106 (N.Y. App. Div. 2d Dept. 2007). That is the situation here. Even if employees acted without direct authorization of management in robbing parts, these acts were indisputably within the scope of their employment and for the benefit of Tower. Similarly, even if Plaintiffs had proven that Tower employees took parts of Fleet and Highland collateral to prepare other planes for return to

34

creditors, these acts could properly be attributed to the
intentional conduct of Tower if they were undertaken within an
employee's usual duties and for Tower's benefit. This is
especially true in light of Tower's interest in satisfying all
of its creditors, not just Highland and Fleet.

As in musical chairs, the inevitable result of Tower's
ongoing practice of robbing was a shortage of parts to install
on all remaining equipment. Fleet and Highland were the victims
of such actions, but they do not have a valid insurance claim to
cover their losses. Because the intentional misconduct of the
insured is not fortuitous, Ingersoll Mill. Mach. Co. v. M/V
Bodena, 829 F.2d 293, 307 (2d Cir. 1987), the intentional acts
of Tower to rob Fleet and Highland's parts without documentation
is not fortuitous. Such claims are not covered by the insurance
policy and Defendants thus did not breach their contract with
Fleet and Highland. The remaining claims in these consolidated
cases are therefore dismissed in their entirety.

## CONCLUSION

Plaintiffs' claims are not covered under the Tower Policy. Judgment is thus entered in favor of Defendants and Plaintiffs' claims are DISMISSED in their entirety.  The Clerk of the Court is directed to close both of the above-captioned cases.

**SO ORDERED:**

_____
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**


Dated:    New York, New York
          July 6, 2011

36